# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01381-COA

**ANTONIO McDOWELL A/K/A ANTONIO P.**          **APPELLANT**
**McDOWELL A/K/A ISHA A/K/A TONIO**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2021 |
| TRIAL JUDGE: | HON. JAMES McCLURE III |
| COURT FROM WHICH APPEALED: | TALLAHATCHIE COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | JAMES W. SHELSON |
| | REUBEN V. ANDERSON |
| | NASH ELLIS GILMORE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY B. FARMER |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 03/07/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Antonio McDowell appeals from the Tallahatchie County Circuit Court's order re-sentencing him to life imprisonment without eligibility for parole. In 2000, McDowell was convicted of capital murder that occurred when he was seventeen years old. At that time, a jury sentenced him to life imprisonment without eligibility for parole. After the 2012 United States Supreme Court decision in *Miller v. Alabama*[1] found mandatory life-without-parole sentences of juvenile offenders to be unconstitutional, McDowell filed a motion for post-

_____

[1] *Miller v. Alabama*, 567 U.S. 460 (2012).

conviction relief (PCR) seeking re-sentencing.[2]  The circuit court granted the PCR motion and convened a jury to hear McDowell's evidence on the factors that *Miller* established for sentencing youths.  After deliberation, the jury could not reach a decision on whether McDowell should be sentenced to life with or without eligibility for parole.  After dismissing the jury, but before the circuit court took any further action, the Mississippi Supreme Court held in *Wharton v. State* (*Wharton II*), 298 So. 3d 921 (Miss. 2019), that capital-murder youth offenders who originally had been sentenced by a jury were not entitled to re-sentencing by a jury.  *Wharton II*, 298 So. 3d at 925 (¶20).  Thereafter, in McDowell's case, the circuit court considered the evidence McDowell had presented to the jury and re-sentenced him to life imprisonment without eligibility for parole.

¶2.     On appeal, McDowell contends that when the jury considering his sentence became deadlocked, the circuit court was required by statute to sentence him to life with eligibility for parole.  In the alternative, McDowell argues that the circuit court abused its discretion in sentencing him to life without eligibility for parole.  Having reviewed the record, arguments of counsel, and relevant case law, we affirm the circuit court's sentence.

### Facts

*A.     Conviction and Original Sentence*

¶3.     On October 5, 2000, when McDowell was seventeen years old, he was convicted of conspiracy to commit robbery and capital murder in violation of Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 1998).  The facts are recited in McDowell's direct appeal,

---

[2] McDowell first received permission from the Mississippi Supreme Court to file the PCR motion.

*McDowell v. State*, 813 So. 2d 694 (Miss. 2002). McDowell was accused of robbing a grocery store and killing Bobbie Whitten in the process. *Id*. at 696 (¶2). Deiago Hill, who was with McDowell, pled guilty to simple murder (as opposed to capital murder) and testified against him. *Id*. at (¶3). Deiago testified that the sawed-off shotgun belonged to McDowell, that the two had skipped school, and that McDowell suggested they rob Whitten's grocery store. *Id*. at (¶¶3-4). Deaigo said that McDowell brought his shotgun with him, and after he shot Whitten, he threw the gun into a pond where law enforcement later found it. *Id*. at 696-97 (¶¶4-5). McDowell testified that he did not participate in the robbery or shooting at all, that he had left the shotgun as Deaigo's house, and that he (McDowell) was asleep in the woods during the crime. *Id*. at 697 (¶6).

¶4.     The jury found McDowell guilty of conspiracy to commit robbery and capital murder. At the time of his crimes, the capital murder statute gave McDowell the right to be sentenced by a jury.[3] Accordingly, the jury further deliberated and decided that McDowell should be

---

[3] Section 99-19-101 (Rev. 1994) provided in part:

Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty. If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any

3

sentenced to life imprisonment without eligibility for parole. *Id*. at 696 (¶1). The circuit

court thereafter sentenced McDowell to serve five years for the conspiracy to commit robbery

to run consecutively with the life-without-parole sentence for the capital murder conviction.

        B.     *Impact of* Miller v. Alabama *on McDowell's case*

¶5.     Years after McDowell's conviction and sentencing as a capital-murder youth offender,

the United States Supreme Court held that mandatory life-without-parole sentences for those

under the age of eighteen violate the Eighth Amendment's prohibition on cruel and unusual

punishment. *Miller*, 567 U.S. at 465. In *Jones v. Mississippi*, 141 S. Ct. 1307, 1311 (2021),

the Supreme Court reiterated the *Miller* holding that the sentencer must consider the

offender's youth and attendant characteristics before imposing a life-without-parole sentence.

*Id.* In addition, the *Miller* ban on mandatory life-without-parole sentences for juvenile

offenders was retroactive, *id.* (citing *Montgomery v. Louisiana*, 577 U.S 190 (2016)), and

required pre-*Miller* capital-youth-offender cases to be re-examined.

¶6.     After *Miller* was decided, the Mississippi Supreme Court allowed McDowell to file

a PCR motion. On March 4, 2016, McDowell filed a "Petition for Post-Conviction Relief

Pursuant to *Miller v. Alabama*" in the Circuit Court of Tallahatchie County. The circuit court

granted the motion on September 1, 2016, and vacated McDowell's life-without-parole

sentence. The court initially denied McDowell's request for re-sentencing by a jury, but after

this Court decided *Wharton v. State* (*Wharton I*), 334 So. 3d 136 (Miss. Ct. App. 2018),

*rev'd*, 298 So. 3d 921 (Miss. 2019), holding that juvenile capital murder defendants who

_____

of the aggravating or mitigating circumstances.

were sentenced before *Miller* were entitled to jury re-sentencing, on January 24, 2019, McDowell renewed his motion. In light of *Wharton I*, the circuit court granted McDowell's motion on February 12, 2019. The State and McDowell then submitted an agreed order to the circuit court, agreeing to present the evidence relevant to the *Miller* factors to a jury. An order setting the date for the jury re-sentencing hearing was entered on March 25, 2019.

¶7. Prior to the hearing, McDowell moved to exclude "victim impact' statements as evidence at the hearing, arguing their irrelevance to the *Miller* factors which are basically concerned with the youth's status, background, and attributes at the time of the crime. The circuit court heard argument on September 12, 2019, and denied McDowell's motion.

    *C.*    Miller *Hearing*

¶8. The circuit court convened a jury and conducted the *Miller* hearing between September 30 and October 1, 2019. McDowell presented testimony from Dr. Criss Lott, a clinical and forensic psychologist. After reviewing an assortment of records, interviewing McDowell for approximately twenty hours, and administering a battery of tests, Dr. Lott concluded that McDowell did not have any significant psychopathy or severe mental illness, though he had been diagnosed with attention deficit disorder. Dr. Lott pointed out that "middle adolescence (roughly 14-17) should be a period of heightened vulnerability to risky behavior because sensation-seeking is high and self-regulation was still immature." In his thirty-three-page report, Dr. Lott described McDowell's upbringing (being raised by his mother and stepfather, his natural father having left when he was a small child), McDowell's education (being in the eleventh grade at the time of the crime and in special education), and

his prior criminal offenses (getting arrested for fighting, being placed on house arrest but then sent to Oakley Training School for three months when he cut his ankle bracelet off, and stealing cigarettes). Dr. Lott noted that as a child, McDowell began smoking cigarettes at age ten, smoking marijuana at age twelve on a daily basis, and drinking alcohol and getting intoxicated once a month starting at age sixteen. McDowell told Dr. Lott that at the time of his arrest, he denied being involved in the crime. But then he admitted he and Hill planned to rob the store, but he never intended to shoot Whitten. Only when Whitten refused to stay on the floor did McDowell shoot him. Dr. Lott tested McDowell for verbal and non-verbal intelligence and determined that his intellectual scores fell in the low-average range. McDowell was reading at the sixth-grade level but had a twelfth-grade sentence-comprehension score. Dr. Lott testified, "In fact, he was above a twelfth grade level, so he continued to advance academically or achieve, if you will, well beyond where he was in high school at the time of his arrest." Dr. Lott noted that having a life-without-parole sentence kept McDowell from educational and work opportunities in prison, which was confirmed by Parchman's superintendent.

¶9. Dr. Lott stated that at the time of the robbery, McDowell was less able and less likely to process information as quickly as adults for him to consider the long-term consequences of his actions. Dr. Lott covered each of the five *Miller* factors and opined that McDowell could be rehabilitated.

¶10. McDowell also called Emmit Sparkman, the superintendent and deputy commissioner at Parchman, who testified about McDowell's conduct during his incarceration. Sparkman

said that in the past ten years, McDowell had not committed an "RVR" (rule violation report). Prior to that ten-year period, McDowell's RVRs were mainly issued for his "having a smart mouth," which Sparkman said was common for young inmates, and fighting with other inmates. There was no record of McDowell being in a gang. Sparkman testified that he saw no evidence that McDowell was incorrigible or that he could not be rehabilitated.

¶11. McDowell testified that he did not remember pulling the trigger when Whitten was shot: "I would say my finger slipped, I know it was an accident. It wasn't in my heart to hurt no one, to take no one's life. That was never the plan, but in the process of trying to rob him, I accidently killed him." McDowell said that when he was younger, he could not own up to what he did, but now he accepted that what he did was wrong. Although the victim's family was not present in the courtroom, McDowell apologized to the family. He admitted that he never wrote a letter to Whitten's widow or the family prior to the hearing apologizing to them. He told the jury that in prison, when he decided not to become a member of a gang, he became prey and got into fights with other inmates. He admitted that there were times he had altercations with prison staff, but he said in those instances he was being mistreated.[4] McDowell also testified that he tried to maintain a job in prison whenever he could.

¶12. The State called Walter Davis and Barry Whitten as witnesses. Walter Davis was employed by the Mississippi Department of Public Safety Criminal Investigation Bureau in

---

[4] McDowell was cross-examined about one altercation with a guard that arose because the guard had snatched McDowell's wife's hand from McDowell during visiting hours. (McDowell was married while in prison, but he testified that his wife did not come to visit anymore.) When McDowell responded to the guard's action by talking in a heated voice with anger, "saliva jump[ed] from my mouth onto his . . . it wasn't that much, just maybe a spec of so." But as a result, McDowell was placed in lock down.

November 1999. His office was called to assist the Tallahatchie County Sheriff's Department in investigating the Whitten shooting. Davis arrived at the scene around 9:30 a.m., but the body had already been removed. There was blood on the truck outside the store and a spent .410 shotgun shell lying on the ground. Davis said there was a trail of blood showing where Whitten's body had been dragged back into the store where it was found. A diagram of the premises and photographs of the crime scene were entered into evidence. Davis testified he went to the hospital to view the body, and he observed a gunshot wound just above Whitten's right eye. Davis testified that McDowell became a suspect after Davis interviewed the school's shop teacher who had helped McDowell repair a bolt on the stock of the shotgun about four weeks prior to the shooting. Davis testified that when he interviewed McDowell, McDowell exhibited no immature behavior. "They seemed normal to me for young men their age. They were able to communicate." McDowell told Davis where he had obtained the shotgun and said that someone had stolen it. Davis proceeded to testify about his interrogation of Deaigo and the resulting facts he concluded about the robbery and shooting. Davis stated that Deaigo had said the night before he and McDowell planned to go to the store that they should tie Whitten up, and rob him. But when Whitten walked out before they could tie him up, McDowell followed, and Deaigo heard the gunshots. They later dragged Whitten's body inside the store.

¶13. Barry Whitten testified that the deceased victim, Bobby Whitten, was his father. His mother, Faye Whitten, died in 2012. Barry identified his mother's signature on a victim impact statement that was entered into evidence. In that statement, Faye said that there were

8

no words to express the family's loss. She said that their grandson, who had lived with them for most of his life, was having violent rage problems since her husband's murder and she was unable to help him because she was having a hard time coping as well. She also said that she lost her financial support when her husband was killed and that at her age, fifty-nine, it would not be easy to get a job. Barry testified that it was hard to lose his father, and he told the jury that if the first jury of twelve had decided to give McDowell life without parole, then he (Barry) could not see how this jury could go against that.

¶14. After the testimony and the presentation of documentary evidence, including photographs of the murder crime scene, and a victim impact statement from Faye Whitten, the jury was instructed on the law. While deliberating, the jury announced it was unable to reach an agreement as to the sentence and sent a note to the judge stating, "We the jury could not reach a decision that we all agreed on. In conclusion, we are a hung jury." On October 4, 2019, the circuit court entered an order declaring a mistrial.

   D.   *McDowell's Motion for Court Sentencing to Life with Eligibility for Parole*

¶15. On October 10, 2019, McDowell moved the circuit court to impose a sentence of life in prison with eligibility for parole pursuant to Mississippi Code Annotated section 99-19-101(3) (Rev. 2015). This section of the statute provides:

> (3) For the jury to impose a sentence of death, it must unanimously find in writing the following:
>
>> (a) That sufficient factors exist as enumerated in subsection (7) of this section;
>> (b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
>> (c) That there are insufficient mitigating circumstances, as enumerated

9

> in subsection (6), to outweigh the aggravating circumstances.

> In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) of this section and upon the records of the trial and the sentencing proceedings. *If, after the trial of the penalty phase, the jury does not make the findings requiring the death sentence or life imprisonment without eligibility for parole, or is unable to reach a decision, the court shall impose a sentence of life imprisonment.*

(Emphasis added). The circuit court heard oral arguments and denied McDowell's motion on November 21, 2019.

> E.     Wharton II *Decided*

¶16.    Before the circuit court took any further action on McDowell's case, on December 5, 2019, the Mississippi Supreme Court reversed this Court's holding in *Wharton I* and held that juvenile defendants were not entitled to re-sentencing by a jury if they had been sentenced by a jury following their original trial. *Wharton II*, 298 So. 3d at 925 (¶20). The supreme court also held that the trial court had erred in vacating Wharton's original sentence. *Id*. at 926 (¶22).

¶17.    On December 17, 2019, the circuit court denied McDowell's motion for a life-with-parole sentence. On January 21, 2020, the State moved the circuit court to set aside its prior order vacating McDowell's sentence and re-sentence McDowell itself, considering the evidence that McDowell had presented to the jury on the *Miller* factors. On February 24, 2020, the court granted the State's motion, and the parties briefed their positions in September and October 2021.

¶18.    On November 18, 2021, the circuit court issued its order that reviewed the *Miller*

10

factors and made specific findings. The court found that McDowell's age did not "import an immaturity, impetuosity, or inability to appreciate the risks and consequences" of his actions. The court found that McDowell knew right from wrong and that his home life had not been dysfunctional. Noting that McDowell had previously been placed in a juvenile correctional facility prior to the murder incident, the court found that the "upward trend in the severity and frequency of criminal activity" reflected a "knowing and deliberate disregard for the law as opposed to impulsiveness or impetuosity." The court further found that although McDowell had apologized to the family, he had not expressed any genuine responsibility or remorse; instead, McDowell claimed the shooting was an accident. Moreover, McDowell had not been a model prisoner. Accordingly, the court re-sentenced McDowell to life imprisonment without eligibility for parole.

¶19.    In his appeal, McDowell raises two issues: (1) whether the circuit court was required to sentence him to life with eligibility for parole because the re-sentencing jury could not reach a decision, and (2) in the alternative, whether the circuit court abused its discretion in sentencing him to life without eligibility for parole in light of the overwhelming weight of the evidence presented on the *Miller* factors that favored a sentence of life with eligibility for parole.

**Standard of Review**

¶20.    "[T]here are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Dotson v. State*, 328 So. 3d 659, 665 (¶23) (Miss. Ct. App. 2021) (quoting *Chandler v. State*,

11

242 So. 3d 65, 68 (¶7) (Miss. 2018)). Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id.* at 665 (¶23); *see also McGilberry v. State*, 292 So. 3d 199, 208 (¶39) (Miss. 2020) (reviewing the trial court's sentencing decision for an abuse of discretion). "Abuse of discretion is the most deferential standard of review appellate courts employ. A finding of abuse of discretion absent a definite and firm identification of clear error violates time-honored standard-of-review principles." *Ferguson v. Univ. of Miss. Med. Ctr.*, 179 So. 3d 1060, 1067 (¶31) (Miss. 2015).

**Discussion**

I.     **Whether the circuit court erred in not sentencing McDowell to life with eligibility for parole when the sentencing jury could not reach a decision.**

¶21. McDowell argues that at the time he filed his PCR motion *Wharton I* had established that former juvenile capital murder offenders were entitled to *Miller* re-sentencing by a jury by statute (Mississippi Code Annotated section 99-19-101). *Wharton I*, 334 So. 3d at 141 (¶15). Pursuant to *Wharton I*, the circuit court vacated McDowell's sentence, and the State agreed that McDowell should be sentenced by a jury. That jury was convened while *Wharton I* was still the controlling law;[5] however, the jury could not reach a decision on McDowell's sentence. McDowell then moved for the circuit court to sentence him to life with eligibility for parole, arguing that such a sentence was mandated by section 99-19-101(3). The circuit court denied McDowell's motion, and later, the Mississippi Supreme Court reversed *Wharton*

_____

[5] We note that *Wharton I* was not yet a final decision because the supreme court granted the State's petition for writ of certiorari. The better course in such situations would be to stay a matter until a final decision has been rendered.

12

*I* and held that because Wharton had been initially sentenced by a jury, he was not entitled to *Miller* re-sentencing by a jury. *Wharton II*, 298 So. 3d at 925 (¶20). Pursuant to this ruling, the circuit court reviewed the evidence McDowell had presented to the jury on the *Miller* factors, and re-sentenced him to life imprisonment without eligibility for parole. McDowell argues that the circuit court erred in not sentencing him pursuant to the statute.

¶22. In his argument, McDowell fails to appreciate the retroactive application of the supreme court's holding in *Wharton II*, which justified the circuit court's actions. If *Wharton II* applied retroactively, then McDowell was never entitled to re-sentencing by a jury, and the statutory provision concerning what sentence to impose if a jury is hung would not apply.

¶23. The Mississippi Supreme Court had held that "as a rule, decisions of this Court are presumed to have retroactive effect unless otherwise specified." *Miss. Transp. Comm'n v. Ronald Adams Contractor Inc.*, 753 So. 2d 1077, 1093 (¶54) (Miss. 2000). The court further stated, "When this Court has held a ruling to apply only to cases subsequent to the opinion, it has specifically stated that the ruling is prospective in nature." *Id.* "As a rule, judicial decisions apply 'retroactively.' Indeed, a legal system based on precedent has a built-in presumption of retroactivity." *Morgan v. State*, 703 So. 2d 832, 839 (Miss. 1997) (citing *Solem v. Stumes*, 465 U.S. 638, 642 (1984)). In *Graves v. State*, 761 So. 2d 950, 953-54 (¶8) (Miss. Ct. App. 2000), we held that intervening supreme court decisions are, for the most part, to be applied retroactively.[6] In examining the effect of an intervening Mississippi

---

[6] The *Graves* decision examined a defendant's claim of error when the circuit court allowed a police officer to testify about the administration and results of a field sobriety test (an HGN test). *Id.* at 953 (¶7). After Graves's trial, the Mississippi Supreme Court decided *Young v. City of Brookhaven*, 693 So. 2d 1355 (Miss. 1997), which held that law

Supreme Court decision on Graves's case, we stated:

> The general rule is that decisions of the Mississippi Supreme Court are presumed to have retroactive effect. *Morgan v. State*, 703 So. 2d 832, 839 (Miss. 1997). Only where "retroactive enforcement would cause serious disruption of the administration of justice and where the prior rule was not infected by a serious absence of fundamental fairness" will decisions of our supreme court not be retroactively applied. *Id.*

*Graves*, 761 So. 2d at 953-54 (¶8).[7]

¶24. The Mississippi Supreme Court did not specifically limit its holding in *Wharton II* to only prospective application. We have recently applied *Wharton II* retroactively in another post-*Miller* case, *Dampier v. State*, No. 2021-KA-00280, 2022 WL 4903820 (Miss. Ct. App. October 4, 2022). In that case, sixteen-year-old D'Andre Dampier was convicted of capital murder in 2004 and sentenced by the trial court to life without eligibility for parole. *Id*. at *1 (¶1). After *Miller* was decided in 2014, Dampier was granted leave to file a PCR motion. *Id*. at *5 (¶23). Dampier also filed a motion for a jury to re-sentence him. *Id*. at *1 (¶2). The circuit court granted the PCR motion and vacated his sentence, but the court denied his motion for a jury sentencing. *Id.* At the time of Dampier's motion for a jury sentencing in 2018, *Wharton I* had issued, and Dampier would have been entitled to re-sentencing by a jury. However, on appeal, we affirmed the circuit court's denial of a jury re-sentencing,

---

enforcement officers could not testify that the test results indicated that a defendant was intoxicated, *id.* at 1360-61, but they could testify that such results gave rise to probable cause to arrest. *Id*. at 1361.

[7] Ultimately, because we found *Young* would apply retroactively, we compared its holding to *Graves*'s facts, found that Graves's case was factually distinguishable from *Young*, and that even in *Young*, the supreme court held that the error was harmless. *Id*. at 954 (¶9).

14

applying, among other cases, *Wharton II*. *Id*. at *7 (¶¶38-39); *see also Alexander v. State*, 333 So. 3d 19, 30 (¶¶49-50) (Miss. 2022) (holding that there is no constitutional right to *Miller* re-sentencing by a jury).

¶25. In the case at hand, we find that *Wharton II* applies retroactively to cases pending at the time of its issuance, which included McDowell's case. Under *Wharton II*, McDowell was not entitled to re-sentencing by a jury, and the circuit court was not limited by the language of section 99-19-101(3) in the sentencing options it could impose.[8]

¶26. We note that even if the circuit court erred in not sentencing McDowell after the jury initially hung, McDowell would still ultimately have to be re-sentenced by the court. McDowell argues that section 99-19-101(3) mandates the circuit court to impose life imprisonment with parole if a jury cannot decide among the sentencing options. However, the relevant statutory section does not say "life imprisonment with parole"; it merely says

---

[8] In the motion he submitted to the circuit court in which he asked that the court re-sentence him to life with eligibility for parole, McDowell presented an unpublished 2014 three-justice Mississippi Supreme Court order in *Dycus v. State*, No. 2012-M-0204, another post-*Miller* re-sentencing case that contained dicta about the statute, stating under section 99-19-101, if the jury considered the *Miller* factors and was unable to reach a decision, "the court shall sentence Dycus to 'life imprisonment with eligibility for parole notwithstanding the present provisions of Mississippi Code Section 47-7-3(1)(h).'" However, as we pointed out in *Cook v. State*, 242 So. 3d 865, 876 (¶39) (Miss. Ct. App. 2017), *Miller* and the subsequent United States Supreme Court decision in *Montgomery v. Louisiana*, 577 U.S. 190 (2016), dealing with sentencing a youth convicted of murder, both allow life-without-parole sentences. As to the *Dycus* order, we stated that "we do not believe that the unpublished order in *Dycus* is controlling or applicable to this case. To begin with, the unpublished panel order has no precedential value. *Westbrook v. City of Jackson*, 665 So. 2d 833, 837 n.2 (Miss. 1995); *see also Miss. Transp. Comm'n ex rel. Moore v. Allday*, 726 So. 2d 563, 566-67 (¶13) (Miss. 1998) (McRae, J., dissenting) ("[O]ur unpublished orders and opinions are of no precedential value[.]")." *Cook*, 242 So. 3d at 877 (¶42). McDowell does not raise the *Dycus* order in his argument on appeal.

"life imprisonment." In *Barnes v. State*, 763 So. 2d 216, 222-23 (¶22) (Miss. Ct. App. 2000), we held that this language meant "life imprisonment without parole." We reasoned:

> The jury was given the option of sentencing Barnes to life, life imprisonment without parole, or death pursuant to Miss. Code Ann. § 99-19-101 (Rev. 1994). They were unable to agree on a verdict, and the trial judge sentenced Barnes to life imprisonment in accordance with Miss. Code Ann. § 99-19-103 (Rev. 1994) which provides "[i]f the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life." Although Miss. Code Ann. § 97-3-21 (Rev. 1994), provides that the jury be given the sentencing options of death, life without parole or life with parole as provided in Miss. Code Ann. § 47-7-3(1)(f)(Supp. 1999), in reality a life sentence imposed after June 30, 1995, automatically means life without parole because Miss. Code Ann. § 47-7-3(1)(f) (Supp. 1999), was amended effective June 30, 1995, to provide that no person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under Miss. Code Ann. § 99-19-101 (Rev. 1994). By operation of the amended parole section, Barnes' life sentence is automatically one without parole.

*Id*. as 222-23 (¶22) (citing *Pham v. State*, 716 So. 2d 1100, 1103 (Miss. 1998)). Therefore, following *Barnes*, had the circuit court followed the mandates of section 99-19-101, the circuit court would have been required to sentence McDowell to life imprisonment without eligibility for parole. But because such a sentence would have offended *Miller*'s prohibition of mandatory life-without-parole sentences, the case would still require the trial-level court to at least consider the sentencing options and apply the *Miller* factors, which the circuit court ultimately did.

**II.     Whether the circuit court abused its discretion in sentencing McDowell to life imprisonment without eligibility for parole.**

¶27.    McDowell alternatively argues that the circuit court abused its discretion in evaluating the evidence presented on the *Miller* factors and sentencing him to life in prison without

16

eligibility for parole.

¶28.    We noted in *Dotson v. State*, 328 So. 3d 659, 666-67 (¶28) (Miss. Ct. App. 2021):

> The [Mississippi Supreme Court] recognized . . . that *Miller* does not prohibit sentences of life without parole for juvenile offenders.  Rather, it requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

(Citations and internal quotation marks omitted).  There are five factors identified in *Miller* that the sentencing entity should consider, including (1) the defendant's chronological age at the time of the offense "and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the defendant's family and home environment; (3) the "circumstances of the homicide offense, including the extent of [the defendant's] participation in the conduct and the way familial and peer pressures may have affected him"; (4) the fact that the defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth"; and (5) the possibility of the defendant's rehabilitation. *Dotson*, 328 So. 3d at 666-67 (¶28) (quoting *Miller*, 567 U.S. at 477-78)); *see also Parker v. State*, 119 So. 3d 987, 995-96, 998 (¶¶19, 26) (Miss. 2013).

¶29.    There is no rebuttable presumption that a juvenile offender is entitled to a sentence of life with eligibility for parole.  *Wharton II*, 298 So. 3d at 926-27 (¶25).  "The burden rests with the juvenile offender to convince the sentencing authority that *Miller* considerations are sufficient to prohibit a sentence of life without parole."  *Dotson*, 328 So. 3d at 667 (¶29) (citing *Wharton II*, 298 So. 3d at 927 (¶25)).  In this regard, "[i]f the offender persuades the judge that the *Miller* factors preponderate in favor of parole eligibility, then the judge must

17

declare the offender parole eligible." *Dotson*, 328 So. 3d at 667 (¶29). "If, however, the judge determines that *Miller* does not mandate parole eligibility, then the judge must deny relief because the Legislature has provided by law that persons convicted of murder are not eligible for parole." *Id.*

¶30. The re-sentencing court has discretion in assessing and applying the *Miller* factors,[9] and may only be reversed if the appellate court finds that discretion has been abused. "Abuse of discretion is found when the reviewing court has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *The Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 535 (¶26) (Miss. Ct. App. 2016).

¶31. In this case, McDowell was provided a full and fair evidentiary hearing to present his evidence on the *Miller* factors. He called several witnesses, including himself. The circuit court then reviewed the testimony and the exhibits and made specific findings relating to the *Miller* factors to support its re-sentence of life imprisonment without eligibility for parole. On appeal, McDowell argues that the circuit court disregarded the "uncontroverted" opinions of his expert; that the circuit court erred "as a matter of law" in finding that the hallmark characteristics of McDowell's youth were indistinguishable from that of an adult offender; and that the trial court's finding that McDowell's "crime did not import an immaturity,

---

[9] "In *Miller* in 2012, the Court allowed life-without-parole sentences for defendants who committed homicide when they were under 18, but only so long as the sentence is not mandatory—that is, only so long as the sentencer has *discretion* to 'consider the mitigating qualities of youth' and impose a lesser punishment." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021) (emphasis added).

18

impetuosity, or an inability to appreciate risks and consequences distinguishable from that of an adult offender" is contrary to Dr. Lott's undisputed expert testimony. McDowell also argues that the circuit court's rejection of uncontradicted evidence was arbitrary and capricious.

¶32.    The State argues that McDowell did not meet his burden of persuading the court in his favor. The State reviews each of the circuit court's critical findings and concludes that the circuit court did not abuse its discretion.

¶33.    As required, we examine the court's findings and the evidence presented on each *Miller* factor to determine whether the circuit court abused its discretion in its judgment on any finding of fact.

### 1.    McDowell's Chronological Age

¶34.    The circuit court found that McDowell was 17 years, 5 months, and 19 days old on the date of the commission of the subject crime—approximately six months short of the age of majority. The court stated that while McDowell received special education services in school, McDowell's IQ testing revealed low-to-average intelligence, and no evidence suggested an inability at the time of the crime to understand the consequences of his actions or distinguish between right and wrong.

¶35.    The circuit court did not ignore McDowell's expert, but in fact, it gleaned many of the factual findings from Dr. Lott's testimony and report. Dr. Lott testified to the exact same findings of the court concerning McDowell's intelligence levels and McDowell's receiving special education services. McDowell disagrees with the conclusions that the court drew

19

from these facts, i.e., that "McDowell's chronological and emotional age at the time of the crime did not import an immaturity, impetuosity, or an inability to appreciate risks and consequences distinguishable from that of an adult offender." McDowell argues that the circuit court disregarded the scientific evidence in Dr. Lott's report and testimony that individuals under age eighteen are significantly immature relative to adults in many variables, due to the still developing parts of the brain. Dr. Lott testified that this causes youths well into their twenties to engage in risky and foolish behaviors like unprotected sex, criminal behavior, attempted suicide, and reckless driving. However, although Dr. Lott did testify about the research on the developing brains of adolescents and the resulting behaviors, Dr. Lott did not specifically apply that research to McDowell's action at the time of the crime. Dr. Lott conceded that not every individual of McDowell's age had poor decision-making. The poor decision McDowell made, according to Dr. Lott, was to shoot Whitten without any regard for what was going to happen to Whitten, the families involved, or himself. Dr. Lott only concluded that "those issues, developmental factors, adversely affected his [McDowell's] judgment and his behavior." Dr. Lott never opined that as a result of the stage of McDowell's development and his education experience, he had an inability at the time of the crime to understand the consequences of his actions or distinguish between right and wrong, as the circuit court found.[10] Viewing all the evidence and the testimony, we find that the circuit court did not abuse his discretion in its findings and conclusions on this *Miller*

_____

[10] Dr. Lott also testified that there was very little difference between seventeen and one-half years old and eighteen years and 300 days old (co-defendant Hill's age). Hill accepted a plea bargain and was sentenced to life with eligibility for parole only after age 65.

20

factor.

### 2. McDowell's Family and Home Environment

¶36. The circuit court found that McDowell did not come from a brutal or dysfunctional family or home environment. Prior to the crime committed, McDowell engaged in the consumption of tobacco, alcohol, and marijuana and had been involved in several fights in school and the community. McDowell tampered with an ankle monitor placed on him by Shelby County, Tennessee officials, and as a result, he served three months in a juvenile correctional facility. McDowell admitted to stealing the gun used in the commission of this crime. The circuit court further found that this upward trend in the severity and frequency of criminal activity by McDowell reflected a knowing and deliberate disregard for the law as opposed to impulsiveness or impetuosity.

¶37. McDowell's own expert did not dispute that this factor had little if any impact on McDowell's criminal behavior. Dr. Lott testified that McDowell reported a reasonably good relationship with his family, and concerning this second *Miller* factor, Dr. Lott said "there wasn't anything significant there, with the exception of he had a relationship with his father, but he didn't have much actual contact with his father. . . . But I thought his family history was, as he said, reasonably positive." Accordingly, we find that the circuit court judge did not abuse its discretion in its evaluation of this factor.

### 3. Circumstances of McDowell's Homicide Offense

¶38. All the facts cited by the circuit court relative to this *Miller* factor are substantiated by the record. The circuit court found that it was undisputed that McDowell, being armed

21

with a stolen, modified shotgun and rope, entered the victim's store on November 3, 1999, with his co-conspirator with the intention of committing robbery. While McDowell admitted that he pointed the gun at the victim and asked him to "get down," McDowell attributed the homicide to an accident. McDowell specifically stated that when the victim failed to comply with McDowell's commands, he "accidentally killed him" and that his "finger slipped." But the victim was shot in the face by McDowell outside of the store and his body was dragged back inside. The circuit court concluded from the evidence that "despite McDowell's apologies to his victim's family, McDowell failed to express any genuine responsibility, sorrow or remorse for his actions," and "contrary to McDowell's testimony, Whitten's death was not the result of an accident or of a child's impulsive behavior."

¶39. As even Dr. Lott testified, usually this *Miller* factor (the circumstances of the crime) deals with peer pressure. Dr. Lott stated, "I don't see that Mr. Hill, Dea[igo] Hill the codefendant, was necessarily pressuring Antonio." Dr. Lott could only testify that *in general*, the presence of another individual only increases the likelihood of greater risk taking behavior. Thus, the evidence supports the circuit court's finding that the crime committed was not the product of peer pressure or the consequence of merely finding himself in the wrong place at the wrong time, and we find no abuse of discretion by the circuit court.

### 4. A Charge and Conviction of a Lesser Offense if not for Incompetencies Associated with His Youth

¶40. This factor involves a youth's ability to deal with the legal system and assist counsel. *Alexander*, 333 So. 3d at 23 (¶17). The circuit court found that there was no evidence suggesting that, due to his age, McDowell was unable to deal with the police at the time he

22

was apprehended. This was supported by Deputy Davis who testified that when he interviewed McDowell, McDowell exhibited no behavior of immaturity. "[McDowell and Deaigo] seemed normal to me for young men their age. They were able to communicate."

¶41. McDowell argues that Dr. Lott testified that McDowell's youth adversely affected his decision to reject a plea deal in the case. But Dr. Lott based this on the fact that McDowell did not appreciate what a life-without-parole sentence might mean—not that McDowell's youth made him unable to deal with law enforcement or assist his attorney. Needless to say, most individuals, whatever the age, would be similarly ignorant of their future experience in prison, which in this case deprived McDowell and prisoners similarly sentenced to access to educational and other rehabilitative programs. Because the proof supported the circuit court's evaluation of this *Miller* factor, we find no abuse of discretion.

### 5. *Possibility of Rehabilitation*

¶42. In *Alexander*, the supreme court stated:

> *Miller* mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a life-without-parole sentence. Neither *Miller* nor this Court requires the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence.

*Alexander*, 333 So. 3d at 29 (¶45) (citations and internal quotation marks omitted). However, one *Miller* factor is the possibility of rehabilitation given the circumstances. In this case, the circuit court noted that McDowell had been less than a model prisoner even though he had not had a rules infraction in the past ten years. Deputy Commissioner Sparkman did testify about McDowell's prison history and noted that McDowell had numerous infractions during

23

his first ten years. McDowell even described one that could be construed as spitting on an officer, which led to his lockdown for several months. However, on the issue of rehabilitation, Sparkman testified only in the negative; he saw no evidence that McDowell was incorrigible or that he could not be rehabilitated.

¶43. Dr. Lott testified that this *Miller* factor asks, "[I]s this guy so different than all the other guys that I've evaluated and see and is so irreparably corrupt that he could never be rehabilitated?" Dr. Lott opined that McDowell could, pointing to McDowell's MDOC history and McDowell's attempts to work and engage in other activities. Dr. Lott felt that although McDowell had a history of inappropriate behavior as well as a horrendous crime, McDowell did not have a severe malevolent or malicious personality disorder that would bar him from participation in rehab programs.

¶44. But the circuit court also found significant that McDowell did not take responsibility, but attempted to justify his prison infractions. Dr. Lott did not address this point. McDowell's own recitation of the incident that led to his lockdown included his justification of why he spit on the guard, supporting the circuit court's finding. Even if there were proof in the record concerning McDowell's activities in his twenty years in prison that indicated McDowell was able to be rehabilitated, this alone does not require a change in his sentence. "There is no Mississippi precedent for the proposition that the possibility of rehabilitation overrides the other *Miller* factors—or even that it is the preeminent factor." *Shoemake v. State*, 323 So. 3d 1093, 1104 (¶40) (Miss. Ct. App. 2019).

¶45. In summary, we find that the circuit court appropriately considered each of the *Miller*

factors. Although it was not required to make any specific findings of fact, *Jones v. State*, 285 So. 3d 626, 632 (¶17) (Miss. Ct. App. 2017), it did. All findings were supported by the record. Accordingly, we hold that the circuit court did not abuse its discretion in sentencing McDowell to life imprisonment without eligibility for parole.

## Conclusion

¶46. Because McDowell was not entitled to re-sentencing by a jury, the fact that the jury in his case could not decide on a sentence is irrelevant, and the circuit court had the authority and responsibility to consider the evidence presented on the *Miller* factors and re-sentence McDowell. Further, we hold that the circuit court did not abuse its discretion in its examination and consideration of the *Miller* factors. The circuit court's sentence of life imprisonment without eligibility for parole is affirmed.

¶47. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**